UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | 2:11-CR-87-PPS |
| v. | ) | |
| BRANDON LEE, | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Defendant Brandon Lee moves to suppress evidence obtained in a warrantless search of his home. [DE 56]. But because the initial entry into the residence was based on the consent of a co-occupant of the residence, and because Lee subsequently signed a consent to search form, the motion to suppress [DE 56] will be denied.

## BACKGROUND

Lee is charged with various drug related crimes involving methamphetamine arising out of the search of his home in Hobart, Indiana. At the suppression hearing, contradictory testimony was presented concerning what took place at the defendant's home on the date of the search. Two DEA Special Agents – Brian Robbins and Michael Burke – testified to one set of facts; the defendant said something completely different; and co-defendant Kristy Saffa, testified to something in between.

According to Agent Robbins, on March 8, 2011, at approximately 4:00 p.m., he and Task Force Agent John Gildein were conducting surveillance near 306 Van Buren Street in Hobart, Indiana. The agents had received information from a source that Brandon Lee was operating a methamphetamine lab and distributing meth somewhere in the Hobart area, but the source hadn't

been able to provide an exact address. Robbins was familiar with Lee from a prior investigation involving methamphetamine, and the agents had tried unsuccessfully to find Lee's residence. Earlier in the day on March 8, the Porter County Sheriff's Office had provided information that Lee might be associated with the 306 Van Buren address, so the agents headed to the neighborhood to see if they could find him.

The agents sat in separate unmarked vehicles, each stationed a block or so away in different directions from Lee's residence. As they watched the area, the agents saw a car drive up to the house and a woman with a baby get out of the car and then go inside. Robbins thought that he recognized the woman as Krystal Lee, who he also knew from a prior investigation involving methamphetamine. (For the sake of clarity, I will refer to Krystal Lee as "Krystal" and to the defendant as "Lee.") In fact, the week before, Robbins and another officer had been working with the Porter County Sheriff's Office to locate Krystal to serve her with an arrest warrant for a probation violation.

The agents first determined that the vehicle was registered to Krystal Lee's mother. And then, about ten minutes after she first went into the residence, Krystal emerged from the house again, got something from her car, and went back inside. Robbins, who had moved about three or four car lengths closer to the residence, used binoculars to confirm that the woman was in fact Krystal Lee. At some point, the agents verified with the Porter County Sheriff's Office that the warrant was still outstanding.

After the agents identified Krystal, Robbins called his boss, Joseph Hathaway, who advised the agents to wait for additional agents, including a female agent, to arrive before attempting to arrest Krystal. After Supervisor Hathaway arrived on the scene, it was decided

that Robbins, Gildein, and Special Agent Burke, who had arrived with the backup agents, would knock on the door of the residence and ask for Krystal. The agents, who did not have a warrant to enter the residence, did not plan a forcible entry. Robbins testified credibly that if the occupants of the house had told him to take a hike and slammed the door in his face, or if they said that Krystal Lee was not at the residence, or if they said that the agents could not come in, then he would have simply called the local prosecutor to obtain a warrant to enter the residence and serve the arrest warrant on Krystal Lee. Clearly, there was probable cause to get the warrant since they saw Krystal enter the house and did not see her leave. But as we'll see in a moment, getting the warrant became unnecessary because the officers were invited into the house.

Robbins was wearing a bulletproof vest, a shirt that said "Police," his badge, and a jacket that said "DEA" on the back. The jacket was fastened in the front with Velcro, covering up his "Police" shirt. Burke was wearing a vest marked with "Police" but he had a sweatshirt over the vest. He did however have a gun that was prominently displayed on his side.

The agents approached the front door of the residence but they couldn't see inside because the front windows were covered with heavy drapes. Robbins knocked on the door with Gildein and Burke behind him. Additional agents were in front of the house and surrounding the perimeter of the residence. Within seconds of Robbins' knock at the door, the agents heard a female voice – co-defendant Saffa's, as it turned out – from inside the house ask "Who is it?" Robbins responded simply "It's Brian." He did not identify himself as a police officer because he feared that if the person inside knew that the cops were knocking on the door, that she might not answer. Saffa partially opened the door, and Robbins undid the Velcro fastenings on his jacket to reveal the "Police" on his shirt to Saffa, to alert her that he was a police officer. Saffa

testified that she did not recall that the officers were wearing any clothing that said "Police," although she did not deny it either. She simply couldn't remember one way or the other. Robbins then asked "Is Krystal Lee here?" Saffa responded "Yes. In the back bedroom."

As she told the agents that Krystal was in the back bedroom, the agents testified that Saffa did three things: she used her hand to gesture back in toward the residence; opened the front door to the house more fully; and said either "come in" or "come on in." When Saffa opened the door Robbins was able to see Krystal from his position on the front porch. She was approximately twenty feet in front of him, in the doorway to a bedroom, holding a baby.

Saffa testified consistently with the officers. She admitted opening the door and gesturing toward the back bedroom. However, she could not recall if she said "come in." Once again, she did not deny saying "come in." She simply couldn't remember one way or the other.

Robbins stepped inside the door that Saffa had opened, and the other two agents followed him inside. As they did so, Saffa pointed toward the back of the home, and at the same time, Krystal began walking forward toward Robbins. Robbins did not have his weapon drawn. Robbins saw Brandon Lee approaching from another area in the house. Robbins told Krystal that he had an arrest warrant for her and asked Krystal if Saffa could hold the baby. Krystal gave the baby to Saffa and Robbins handcuffed Krystal.

Lee's version of these events differed from Robbins, Burke, and Saffa's accounts. Lee testified that he, Saffa, and Krystal were in the back bedroom of the house, preparing to do lines of meth that he had just prepared and that Saffa had just gotten up to go to the kitchen to get a drink when there was a knock at the door. When Lee heard the knock, he hid the mirror that he was using to cut meth into lines. Lee started walking down the hallway toward the front door

and was standing in the hallway when he heard a man's voice outside say "It's Dave." Saffa then opened the front door about three to six inches, and the man's voice asked if Krystal Lee was there. Saffa responded "Yes. She's in the back bedroom." At that point, Krystal started walking toward the front door and said "I'm coming." According to Lee, Robbins then pushed his way into the house, through the door and past Saffa. Lee testified that Saffa never consented to Robbins' entry, either verbally or with gestures, and that Robbins did not identify himself as a police officer until he handcuffed Krystal.

While Lee, Krystal, and Saffa were congregating in the home's central hallway and Robbins was placing Krystal under arrest, Special Agent Burke entered the house and did a protective sweep. Burke testified that he saw a closed door off of the hallway with a light on inside, and he was concerned that another person could be behind it. So he opened the door and discovered that it was a small bathroom. Burke noticed that there was a portable fan or air purifier in the bathroom. Beneath the bathroom sink was a cabinet unit. The door of the cabinet unit was slightly ajar, perhaps two or three inches. From his position in the bathroom, Burke was able to see plastic tubing and coffee filters inside the cabinet. Both Robbins and Burke testified that these materials are generally used to produce methamphetamine. For his part, Lee testified that he had cooked methamphetamine 45 minutes before the officers came into the house, but that he was certain that he had shut the cabinet doors completely when he finished.

After Krystal's arrest, Burke alerted Robbins that he believed that he had found a methamphetamine lab. At that point, the agents handcuffed Lee and took him outside to question him further. Robbins put Lee in his car and read Lee his Miranda rights. He then asked Lee if he was willing to cooperate. Robbins told Lee that if he provided information, such as the

names of Lee's meth customers, Lee would not be arrested that night. Lee agreed to cooperate and answered Robbins' questions and signed a consent to search form. Robbins denied that he made any promises to Lee that charges would never be brought. Robbins asked Lee if anything else was in the residence, and in particular if anything might explode or harm the people in the house. Lee responded that in addition to the items under the sink, there was approximately 1 gram of methamphetamine in the house. Lee also said that he had last operated a meth lab about a week before, but denied that there was any cooking or reactions going on at that time.

After Lee signed the consent form, DEA agents conducted a preliminary search of the house. The Indiana State Police methamphetamine team, a unit that specializes in searches and takedowns of meth labs, secured and searched the residence. The team confirmed that there was actively cooking methamphetamine in a back bedroom of the house. Additionally, the agents found women's clothing, pictures, mail, and bills indicating that Saffa was living in the house with Lee. So there is no dispute that Saffa lived in the house with Lee and that she had the ability to consent to the initial entry into the home. But there is a dispute over whether she in fact provided that consent.

## DISCUSSION

Lee seeks to suppress all the evidence recovered from the search of his home, and everything that flowed from it, including the statements he made to Agent Robbins that day. Lee argues that this evidence should be suppressed because the agents' initial entry into his house was unlawful and without consent, and that his signing of the consent to search form was not done voluntarily. [DE 56 at 2-3, DE 71 at 3-5.] There are essentially three things I need to analyze: 1) the initial entrance into Lee's residence; 2) the ensuing protective sweep of the

-6-

residence; and 3) the questioning of Lee in Robbins' truck and the signing of the consent form. I will address each one separately.

**I.      The Entrance into Lee's Residence**

Law enforcement officers cannot enter a third party's home to search for the subject of an arrest warrant without first obtaining a search warrant. *Steagald v. United States*, 451 U.S. 204, 205-206 (1981). But it is "well-settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *U.S. v. Garcia*, 897 F.2d 1413, 1419 (7th Cir. 1990) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). Voluntary consent can be obtained from either the individual whose property is searched or from a third party who shares authority over the premises. *Georgia v. Randolph*, 547 U.S. 103, 106 (2006); *U.S. v. Matlock*, 415 U.S. 164, 169-170 (1974); *U.S. v. Bell*, 500 F.3d 609, 612-13 (7th Cir. 2007).

The government bears the burden of proving voluntary consent by a preponderance of the evidence. *Garcia*, 897 2d at 1419. The consent may be express or implied, but need not be knowing and intelligent, and may be given unintentionally and without knowledge of the right to refuse consent. *Schneckloth*, 412 U.S. at 234-36; *U.S. v. Saadeh*, 61 F.3d 510, 518 (7th Cir. 1995) (consent to search was voluntary even though suspect was not informed of right to refuse consent).

Lee's objection to the agents' initial entry into the house is not that Saffa's consent was involuntary or that it was the product of duress or coercion. Rather, Lee argues that Saffa never gave consent at all. [DE 56 at 2, DE 71 at 2-3.] To begin with, there is no question that Saffa was empowered as a co-occupant of the home to consent to its search. *Randolph*, 547 U.S. at

106; *Matlock*, 415 U.S. at 169-170; *Bell*, 500 F.3d at 612-13.

The next question is whether Saffa did in fact give consent to the agents to enter the residence. If verbal consent was given, the agents were free to enter the residence to search for Krystal Lee (the subject of the arrest warrant), and the Fourth Amendment would not be violated. *U.S. v. Dean*, 550 F.3d 626, 630 (7th Cir. 2008). Whether Saffa gave voluntary consent is a question of fact that is determined based on the totality of the circumstances. *U.S. v. Lewis*, 608 F.3d 996, 999 (7th Cir. 2010); *U.S. v. Price*, 54 F.3d 342, 345 (7th Cir. 1995).

Agents Robbins and Burke both testified at the hearing that Saffa said "come in" or "come on in" after the agents asked if Krystal Lee was in the house. Saffa did not deny giving verbal consent; she could not remember one way or the other. Lee, who was not at the door at the time, but was in the hallway when the exchange took place, testified that Saffa did not tell the agents that they could come in. This testimony was a bit dubious. How could Lee know definitively whether Saffa gave verbal consent? Perhaps she said "come on in" and he simply didn't hear it. In any event, I find that the testimony of the agents is credible, and that Saffa gave verbal consent to enter the residence. Both agents testified consistently regarding how they approached the door and the exchange that took place after Saffa opened the door. The entry into the home was consensual and did not violate the Fourth Amendment.

What's more, Saffa also gave non-verbal consent for the agents to come into the house. Consent to enter can be non-verbal. *U.S. v. Villegas*, 388 F.3d 317, 324-25 (7th Cir. 2004); *U.S. v. Cotnam*, 88 F.3d 487, 495 (7th Cir. 1996). In other words, a person's actions alone can manifest his or her consent to a search. *U.S. v. Walls*, 225 F.3d 858, 863-64 (7th Cir. 2000); *U.S. v. Rosario*, 962 F.2d 733, 735, 737 (7th Cir. 1992). Recall that after Saffa opened the door, the

agents asked if Krystal Lee was there, and independent of her words, Saffa non-verbally communicated to the agents that Krystal was in the house, and that they could enter it. She did this by opening the door wider, stepping back, and gesturing into the house. Opening a door, stepping back to permit agents to enter the home, and gesturing to come in convey consent to enter. *Lewis*, 608 F.3d at 999; *Walls*, 225 F.3d at 862-63; *Rosario*, 962 F.2d at 737. In this case, it is clear from the testimony of the officers – and from Saffa herself – that her actions constituted non-verbal consent to enter the house to find Krystal.

It seems rather obvious that Saffa intended for the agents to come in when she gestured for them to do so. But even if Saffa did not intend her gesture to be an invitation to enter, it would not matter. This is because if it was reasonable for the agents to interpret it that way, the entry would have been lawful. *Cotnam*, 88 F.3d at 495. Both Robbins and Burke testified that the gesture was "inviting." Under the circumstances, with Saffa opening the door, stepping back into the house, and making a sweeping gesture inside, it was reasonable for the agents to interpret her actions as consent to enter.

Moreover, as noted above, although Saffa testified that she did not recall giving the agents express consent to enter the residence, she also testified that she never told the agents that they *couldn't* enter. Had she felt that the agents misinterpreted her actions as consent to enter, when she had intended her actions to mean that the agents could not come in, she could have objected. Her failure to object, once the agents entered the residence, is further evidence that her conduct was intended as consent. *Price*, 54 F.3d at 346; *Lewis*, 608 F.3d at 999.

Lee claimed at the suppression hearing that the agents forced their way into the residence, pushing their way in through the door when Saffa had it open just a few inches. This

-9-

testimony is not credible inasmuch as it was contradicted by every other witness, including Saffa herself. Recall that Saffa testified that after the agents asked if Krystal Lee was in the house, that she opened the door and turned toward Krystal. There was no testimony that the agents were brandishing weapons or that they threatened Saffa in any way. Other than Lee's statement that the officers pushed their way in, which was contradicted by the testimony of every other witness, there is "nothing in the sequence of events that evidences coercion or duress." *Villegas*, 388 F.3d at 325 (citing *Walls*, 225 F.3d at 863). I find that Saffa gave voluntary consent to the agents to enter the residence to search for Krystal Lee, and that there was no Fourth Amendment violation. There's one more matter to address: Saffa's consent is not rendered involuntary by the fact that Robbins did not explicitly identify himself as a law enforcement officer when he knocked on the door. "A government agent may obtain an invitation onto property by misrepresenting his identity" or by using "ruses," as long as agents do not exceed the scope of their consent upon entry. *U.S. v. Scherer*, 673 F.2d 176, 182 (7th Cir. 1982); *U.S. v. Leung*, 929 F.2d 1204, 1208 (1991). In other words, a police officer doesn't have to say that he is a police officer in order to gain a person's consent to come into the person's house – he can pretend that he is someone else. *Scherer*, 673 F.2d at 181-82; *Leung*, 929 F.2d at 1208 (permissible for agent to stand behind a hotel housekeeper and wait for her to knock on the occupant's door.)

Here, Robbins testified at the hearing that he only said that his name was "Brian" (which is true, by the way). Robbins feared that Saffa would not answer the door to talk to him if she knew that the police were outside. But once Saffa did open the door, Robbins undid his jacket to expose the word "Police" on his clothing and asked if Krystal Lee was inside. Saffa told him to "come in" and gestured for him to enter after he asked if Krystal was inside, meaning that the

scope of the invitation was to locate Krystal. That is exactly what Robbins did once he entered the house. Robbins did not exceed the scope of the invitation, and the way that he identified himself did not in any way render Saffa's consent involuntary.

## II. The Protective Sweep of Lee's Residence

Because the agents entered the residence to arrest Krystal Lee with Saffa's consent, they were lawfully in the house. And once officers are lawfully in a residence and executing an arrest warrant, they can conduct a protective sweep of areas immediately adjacent to the place of arrest to search for imminent danger to the agents. *Maryland v. Buie*, 494 U.S. 325, 334 (1990); *Leung*, 929 F.2d at 1209. "A protective sweep is a quick and limited search of a premises, incident to an arrest and conducted to protect the safety of police officers and others." *U.S. v. Richards*, 937 F.2d 1287, 1291 (7th Cir. 1991). A search beyond the immediate area of the arrest must be justified by facts that would lead a "reasonably prudent officer" to believe that the additional area holds a person who could endanger the officers. *Buie*, 494 U.S. at 334.

As an aside, I will note that the parties have not raised the issue of whether a protective sweep is proper in the context of a consent entry into a home. *Buie* itself involved a protective sweep pursuant to the execution of an arrest warrant. 494 U.S. at 328. There is a split in authority on whether *Buie* protective sweeps are appropriate in conjunction with exceptions to the warrant requirement, such as exigent circumstances, execution of search warrants, or, as relevant here, consent entries. The majority of circuits have held that *Buie* does not require a protective sweep to be conducted incident to an arrest. *U.S. v. Martins*, 413 F.3d 139, 150 (1st Cir. 2005) (a protective sweep is proper whether an arrest warrant, a search warrant, or the existence of exigent circumstances prompts the agents' entry); *U.S. v. Gould*, 364 F.3d 578, 593

(5th Cir. 2004) (protective sweep pursuant to consent entry is appropriate) (*rev'd on other grounds by Kentucky v. King*, 131 S.Ct. 1849, 1861 (2011); *Leaf v. Shelnutt*, 400 F.3d 1070, 1087-88 (7th Cir. 2005) (protective sweep pursuant to exigent circumstances is proper if reasonable under the Fourth Amendment); *U.S. v. Taylor*, 248 F.3d 506, 513 (6th Cir. 2001); (protective sweep permissible when an officer is left behind to secure the premises while a warrant is being obtained); *United States v. Garcia*, 997 F.2d 1273, 1282 (9th Cir. 1993) (protective sweep pursuant to consent entry is proper); *United States v. Patrick*, 959 F.2d 991, 996-97 (D.C. Cir. 1992) (same) (*rev'd on other grounds by Apprendi v. New Jersey*, 530 U.S. 466 (2000). However, the Tenth Circuit has held that protective sweeps are permissible *only* when incident to an arrest. *U.S. v. Freeman*, 479 F.3d 743, 750 (10th Cir. 2007). And other cases have taken a narrow view of protective sweeps when conducted as part of a consent entry because such searches could exceed the scope of consent, posing a particular danger of abuse and evasion of the warrant requirement. *See, e.g.*, *U.S. v. Hassock*, 631 F.3d 79, 86-88 (2d Cir. 2011).

However, I need not choose sides in that debate because this case falls squarely under the rubric of *Buie*. Although the officers initially had to obtain voluntary consent to enter the home to find Krystal because the home that she was in was not her own, *see Steagald*, 451 U.S. at 205-06, once they did so, they were lawfully in the home and were able to place Krystal under arrest. Under *Buie*, agents are permitted to conduct a protective sweep "incident to arrest." 494 U.S. at 334. Because the agents had an arrest warrant for Krystal, a protective sweep pursuant to that arrest was perfectly permissible.

Burke provided a number of reasons for conducting the protective sweep. First, upon

-12-

entering the house, he saw Saffa, Lee, and Krystal gathered in a small hallway in front of a closed door. In addition to the door being closed, the light was on behind the door, which indicated to him that someone could be inside. Burke did not know how many other people, if any, might be inside the house. Burke also had information that Lee might be manufacturing methamphetamine inside the house, and he testified that in his training and experience, methamphetamine users can be erratic and violent. On these facts, Burke's belief that a possible threat to officer safety could be hiding behind the door was reasonable, and his entry into the bathroom was proper as a protective sweep.

While conducting a protective sweep, officers can seize objects that are in plain view. *U.S. v. Barker*, 27 F.3d 1287, 1289, 1291-92 (7th Cir. 1994). Under the plain view doctrine, law enforcement agents can seize items if the incriminating nature of the item is immediately apparent. *U.S. v. Raney*, 342 F.3d 551, 558-59 (7th Cir. 2003). For the "incriminating nature" of the item to be readily apparent, the officer need only have probable cause to think that the item is linked to criminal activity. *U.S. v. Bruce*, 109 F.3d 323, 328 (7th Cir. 1997).

Here, Burke was conducting a lawful protective sweep of the bathroom when he saw methamphetamine paraphernalia under the sink. He testified credibly that the door to the bathroom cabinet was ajar, and that he could see narrow plastic tubing and coffee filters through the opening. Although Lee testified that he closed the door to the cabinet when he cleaned up the bathroom after he finished cooking meth that day, I credit Burke's testimony that the door was open. "That the items themselves were perfectly lawful for [Lee] to have possessed does not bar the application" of the plain view doctrine. *Raney*, 342 F.3d at 559. So while tubing and coffee filters are not, by themselves, incriminating, it's certainly odd that they were in a

-13-

bathroom. Combine that with the testimony from Burke and Robbins that these items were in a place where a portable fan or air purifier existed, and all indicia were that this was where the methamphetamine was being cooked. Recall as well that the whole reason the agents were at the house in the first place was information they had that Lee was operating a methamphetamine lab. In other words, the context in which Burke found the items in the bathroom supports the conclusion that these items were incriminating, and gave the officers probable cause to seize the items without a warrant. *See U.S. v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998) (context in which items are found can cause items to assume an incriminating purpose).

### III. The Statements to Robbins

Lee's final salvo is that his consent to search the house was not voluntary because it was given under duress after he had been handcuffed and placed in Robbins' car and told that he would not be arrested that night if he cooperated with the agents. The government bears the burden of proving that Lee's consent was freely and voluntarily given. *Garcia*, 897 F.2d at 1419 (quoting *Schneckloth*, 412 U.S. at 219). "The question whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *U.S. v. Strache*, 202 F.3d 980, 985 (7th Cir. 2000) (quoting *Schneckloth*, 412 U.S. at 227). A statement is voluntary if it is the product of free will and is not the result of physical abuse or psychological intimidation. *United States v. Richardson*, 657 F.3d 521, 525 (7th Cir. 2011). To assess voluntariness, I am to consider (1) Lee's age, education and intelligence; (2) whether Lee was advised of his constitutional rights; (3) the length of detention prior to consent; (4) whether Lee consented immediately or police made repeated requests for consent; (5) whether physical coercion was

used; and (6) whether Lee was in custody. *Strache*, 202 F.3d at 985. No single factor is controlling, and I am to carefully scrutinize all of the surrounding circumstances. *Id.*

An analysis of these factors supports the conclusion that Lee voluntarily signed the consent form and cooperated with Robbins. Lee testified that although he used methamphetamine on a fairly regular basis, he had not used any on the day he was arrested. There is no evidence that Lee was not able to converse with Robbins or express himself clearly, and there is also no evidence that Lee had any kind of mental defect. He was advised of his Miranda rights prior to signing the consent form. Lee and Robbins both testified that they talked in Robbins' car for about 45 minutes before Lee signed the consent to search form. That length of interrogation is not itself coercive. *See U.S. v. Ceballos,* 302 F.3d 679, 693-94 (7th Cir. 2002) (two 45-minute interrogation sessions did not render confession involuntary because the duration of the questioning was "relatively short"); *Richardson*, 657 F.3d at 525 (defendant handcuffed in police car for 51 minutes did not rise to level of "coercive police activity sufficient to overcome [defendant's] will). There was no evidence of any kind of physical coercion. Although Lee was handcuffed and in police custody when he gave his consent to search the residence, custody alone is not dispositive of voluntariness so long as the "coercive effect of custody was mitigated by the surrounding circumstances." *Strache*, 202 F.3d at 986. Although Lee was handcuffed and in an agent's vehicle, there is no evidence that he was badgered for information or his consent, nor physically abused or pressured. *See id*.

Lee argues that he was coerced in a non-physical way. Lee claims that he was told that if he "played ball" that he could "help himself." He understood this to mean that he had to sign the consent form if he wanted to be released, and that this coerced him into signing the consent

form involuntarily. [DE 71 at 5.] Lee testified that he asked Robbins what jail he would be taken to, and that Robbins responded that "it depends," and that if Lee would "play ball," that he would not be arrested that day. Robbins testified in essentially the same manner, and said that he told Lee that if he cooperated with the investigation and provided verifiable information, that Lee would not be arrested that night. But Robbins made no promises or threats to Lee to get him to sign the consent form, and he never told Lee that no charges would be brought or that he would not get into any trouble if he cooperated.

A statement to a defendant that he will not be arrested that night if he consents to a search does not render his consent involuntary. *U.S. v. Cichon*, 48 F.3d 269, 270-71, 274, 276 (7th Cir. 1995) (*rev'd on other grounds by U.S. v. Baldwin*, 48 F.3d 269 (7th Cir. 1995). "Government is not forbidden to 'buy' information with honest promises of consideration." *U.S. v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990). Offers of the type made by Robbins required Lee to "weigh the cost in giving the government information...against the benefit in possibly receiving brownie points for cooperation." *Id.* The evidence shows that when given the opportunity to avoid being arrested that evening – which he could have been, as the agents certainly had probable cause to arrest at that point – Lee gave information about his methamphetamine customers and signed the consent form. A law enforcement officer is permitted to offer a defendant a way to retain his freedom, and the "choice between cooperation and freedom, on the one hand, and silence followed by custody and prosecution, on the other, is a common one." *U.S. v. Miller*, 450 F.3d 270, 272 (7th Cir. 2006) (*rev'd on other grounds by Kimbrough v. U.S.*, 552 U.S. 85 (2007)). An officer putting this choice into words "makes a choice better informed and thus more rather than less voluntary." *Id.* Nothing about the exchange that Lee and Robbins described indicates that

Lee was somehow coerced into signing the consent form, or that his doing so was involuntary. I find that Lee voluntarily signed the consent to search form.

## CONCLUSION

On this record, the Court cannot find any violation of Lee's rights under the Fourth Amendment. Accordingly, defendant Brandon Lee's motion to suppress evidence [DE 56] is **DENIED**.

**SO ORDERED.**

ENTERED: December 14, 2011

                                           s/ Philip P. Simon
                                           PHILIP P. SIMON, CHIEF JUDGE
                                           UNITED STATES DISTRICT COURT